FILED

MAR 23 2012

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* DR. STEPHEN J. GRAHAM, and DR.<br>STEPHEN J. GRAHAM<br>individually,<br>         Plaintiffs,<br><br>v.<br><br>MOBILE DOCTORS USA, L.L.C., and<br>MOBILE DOCTORS MANAGEMENT, L.L.C.,<br><br>         Defendants. | 12cv2146<br>Judge Holderman<br>Mag. Judge Cox<br><br>FILED UNDER SEAL<br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff-Relator Dr. Stephen Graham, through his attorneys James T. Ratner and Michael Rosenblat, complain and state as follows:

**I.     NATURE OF THE ACTION**

1.     This is an action to recover damages and civil penalties on behalf of the United States of America under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*

2.     This FCA action arises from false statements, false records, and false claims submitted to the United States by Defendants Mobile Doctors USA, L.L.C., and/or Mobile Doctors Management, L.L.C., ("Mobile") in order to get these false claims paid.

3.     Relator Dr. Stephen J. Graham ("Relator") alleges that Mobile has violated the FCA by systematically submitting false or fraudulent claims to Medicare by: (1) submitting claims for physician home visits at a higher reimbursement, CPT Code, then was supported by the home visit either in terms of time or complexity; (2) submitting claims for diagnostic testing that was not reasonable and necessary for diagnosis or treatment; (3) submitting claims for diagnostic tests which were not performed; (4) submitting claims for diagnostic tests performed

on faulty equipment, rendering the tests worthless and thus not reasonable and necessary for diagnosis or treatment; and (5) submitting claims for services provided to Medicare patients without requiring the Medicare beneficiary to pay a copay.

## II. PARTIES

4. Relator Dr. Stephen J. Graham is a resident of the State of Arizona. Relator is a graduate of the University of Miami School of Medicine, and has been a licensed medical doctor since 1991. Dr. Graham is currently working in the fields of general medicine and urgent care. Dr. Graham was employed by Defendants for approximately four months from October 2011 through January 2012.

5. Defendants Mobile Doctors Management, L.L.C., and Mobile Doctors USA, L.L.C., ("Mobile") is a physician management company providing care to patients in their homes, and at home health agencies. Mobile's corporate headquarters is located in Chicago, Illinois at 1229 N North Branch, Suite 206, and Mobile currently operates in and serves at least five metropolitan areas throughout the country, including, Phoenix, Arizona; Indianapolis, Indiana; Detroit, Michigan; Kansas City, Missouri; and Chicago, Illinois. Mobile has approximately one hundred forty (140) employees, and has tens of thousands of patients throughout the country. The vast majority of Mobile's patients are Medicare beneficiaries.

## III. JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

7. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Defendants transact business in the

United States. Defendants can be found in, reside in, and/or transact or have transacted business related to the allegations in this complaint within the Northern District of Illinois.

8. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), as Defendants can be found in, reside in, and/or transact business in the Northern District of Illinois.

9. This suit is not based upon prior public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

10. To the extent that there has been a public disclosure, Relator is an original source under 31 U.S.C. §3730 (e)(4). Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under these sections.

11. Relator Dr. Graham served on the Attorney General of the United States and the United States Attorney for the Northern District of Illinois substantially all material evidence and information he possess in accordance with the provisions of 31 U.S.C. §3730(b)(2).

## IV. THE MEDICARE PROGRAM

12. The Medicare program was enacted under Title XVIII of the Social Security Act, in 1965, to pay for certain healthcare services based primarily on age. The Department of Health and Human Services ("HHS") administers the Medicare Program, as promulgated by 42 U.S.C. §§ 1395 et seq. The Center for Medicare and Medicaid Services ("CMS") is the agency of HHS that is directly responsible for the administration of the Medicare Program. The Medicare program provides for the payment of claims submitted to it by healthcare providers for services

rendered to its beneficiaries.

13. In each of the locations that Mobile operates, a third party known as a fiscal intermediary processes the Medicare claims for beneficiaries located in local.

## V. THE FALSE CLAIMS ACT

14. The FCA provides in pertinent part that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G), is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(l).

## VI. MOBILE'S UPCODING OF PATIENT ENCOUNTERS

15. Medicare Benefit Policy Manual, Chapter 7, Sec. 30.1.1 (Rev. 04/15/11), states in pertinent part:

> In order for a patient to be eligible to receive covered home health services under both Part A and Part B, the law requires that a physician certify in all cases that the patient is confined to his/her home. An individual does not have to be bedridden to be considered confined to the home. However, the condition of these patients should be such that there exists a normal inability to leave home and, consequently, leaving home would require a considerable and taxing effort.

16. Relator, while performing home health service for Mobile, observed that as many as 50% of the patients he was assigned to provide home health service to by Mobile did not meet the criteria to be eligible to receive covered home health services under Part B in that leaving the home would not require a considerable and taxing effort.

4

17.     Despite the fact that these patients did not qualify for home health services, Mobile routinely submitted false claims to Medicare certifying that these patients were eligible to receive home health services.

18.     Mobile has submitted thousands of false claims for covered home health services for patient who were not eligible to receive home health.

19.     There are several CPT (Current Procedural Terminology) codes for initial home visits by physicians. CPTs 99341- 99345 are for new patients, often referred to as evaluation and management (E & M) codes. These CPT codes, all for initial home visits, are differentiated as follows:

| | |
|---|---|
| 99341 | Low severity problem, 20 min. |
| 99342 | Moderate severity problem, 30 min. |
| 99343 | Moderate to high severity problem, 45 min. |
| 99344 | High severity problem, 60 min. |
| 99345 | Patient unstable or significant new problem requiring immediate physician attention, 75 min. |

20.     The treating physician rarely codes the services provided to the beneficiary. Instead the coding of the services is often undertaken by the clinical care coordinators under the supervision of the local office managers, and at Mobile's headquarters in Chicago.

21.     Mobile directs the clinical care coordinators to follow instructions from a coding book created by Mobile, detailing how to code various patient encounters. The coding book instructs Mobile's employees to use only the two highest E & M codes for the initial home visit, those being CPT codes 99344 and 99345, even though there are five CPT codes to choose from. Thus the Mobile coding book directs its employees to code these procedures not lower than 99344 regardless of the length of the visit, or the acuity of the patient. Codes 99344 and 99345 require that doctors spend either 60 minutes or 75 minutes with the patient, respectively, and require that the patient have a condition of high severity.

22. CPT code 99344 is more fully defined as follows:

> Home visit for the evaluation and management of a new patient, which requires three components: a comprehensive history; a comprehensive examination; and medical decision making of moderate complexity. Usually, the presenting problem(s) are of high severity. Physicians typically spend 60 minutes face-to-face with the patient and/or family.

23. If Mobile's doctors have not coded these encounters as 993444 or 99345 on their own, management will do so, by either crossing out the lower coding or, if left blank, checking off 99344 or 99345 themselves.

## VII. SPECIFIC EXAMPLES OF UPCODING

24. Patient A is a 41 year old female and Medicare beneficiary who Relator visited in her home on December 29, 2011. She had been treated and released from the hospital after being diagnosed with pneumonia. Although Relator spent no more than 45 minutes with the patient, Mobile coded the visit under CPT Code 99344.

25. Relator observed that Patient A, was a little short of breath, but did not present any symptoms of high severity, and would have been able to visit a primary care physician on her own without difficulty.

26. Therefore, on or about December 29, 2011, Mobile submitted a false claim to the government by billing CPT code 99344 for the examination of Patient A.

27. Medicare Patient B is a 66 year-old individual who evidenced some general weakness and use of a walker, who Relator visited at Patient B's home on December 28, 2011. Patient B had some chronic conditions including anemia. No symptoms of high severity were found by Relator. Relator spent no more than 45 minutes with this patient. Mobile coded and billed this encounter as CPT 99344, and therefore represents an up-code as the requirements for 99344 were not present.

28. Therefore, on or about December 28, 2011, Mobile submitted a false claim to the government by billing for CPT code 99344 for the examination of Patient B.

29. Medicare Patient C is an 87 year-old man who was visited at his home by Relator on December 20, 2011. Although suffering from some dementia, Patient C is a power walker and is physically healthy for his age. He lives with his wife, also a Mobile patient, and who is not homebound. Relator was informed by Patient C that the reason Patient C and Patient C's wife wanted to be treated at home is that Patient C had lost his driver's license, and he enjoyed the convenience of the home visit. The visit was coded by Mobile as 99344. No high severity of symptoms were observed and no more than 45 minutes was spent Patient C.

30. Therefore, on or about December 20, 2011, Mobile submitted a false claim to the government by billing for CPT code 99344 for the examination of Patient C.

31. Medicare Patient D is a 66 year-old man who was visited by Relator at his home on December 15, 2011. This patient has chronic conditions such as COPD and a heart murmur but presented no severe symptoms. Patient D was not confined to the home, and was capable of visiting a physician outside his home. Mobile coded this encounter as 99345, without any justification. Relator spent no more than 45 minutes with this patient.

32. Therefore, on or about December 15, 2011, Mobile submitted a false claim to the government by billing for CPT code 99345 for the examination of Patient D.

### VIII. BILLING FOR SERVICES NOT ORDERED BY PHYSICIANS

33. Mobile provides its patients home testing services such as Doppler testing of the carotid artery, echocardiograms, and venous ultrasounds, as well as other tests. Technicians employed by Mobile go to the patients' homes and conduct these tests on equipment maintained by Mobile. Mobile bills Medicare for these tests.

7

34. In a vast number of cases, these tests are never ordered by physicians, but instead are "ordered" by Mobile's non-medical employees, who then alter patient records to make it appear as if the physician had ordered the diagnostic test.

35. Mobile gives each of its physicians, routing slips on which the physician is able to code the patient encounter, list diagnoses, and order tests, if necessary. But Mobile has a fondness for certain expensive tests such as the Doppler carotid, echocardiogram, and venous ultrasound. If the doctor doesn't order these tests, Mobile routinely uses corrupt practices to see that they are nonetheless carried out and billed to Medicare.

36. Each day the routing slips are filled out by the doctors, signed, and then forwarded to the office clinical coordinators. The coordinators review the routing slips and if, for example, an echocardiogram was not ordered by the doctor, because it was not reasonable and necessary for the diagnosis or treatment of illness or injury, a post-it note would be placed on the routing slip by the clinical coordinators and sent back to the doctor, directing him to order the echocardiogram. If the doctor refused, as was often the case, Mobile's Phoenix branch manager Lou Pavelchik would routinely check-off echocardiogram on the routing slip himself, *after* the doctor had dated and signed the routing slip. Then this altered routing slip would be scanned and forwarded to Mobile's headquarters in Chicago for billing. If the local clinical coordinator or branch manager failed to order a test, Mobile's Corporate Headquarters would return the routing slip back to the respective branch with the unordered diagnostic test such as an echocardiogram highlighted. This review by the main office was a daily occurrence at Mobile.

37. The fraud was not limited to the routing slips. On or about while employed by Mobile, Relator observed that Pavelchik would make changes to the actual patient charts, adding "observations", and "diagnoses" to it in an attempt to justify the billing for the unnecessary tests

8

or the home visit coding. For instance, one such Mobile's practices in this regard concerned Parkinson's disease. Pavelchik stated that all patients with Parkinson's also should have a diagnosis of an unsteady gait documented in the chart, whether or not they had an unsteady gait. If the doctor did not observe an unsteady gait, Pavelchik would on many occasions, add it to the patient chart himself. Pavelchik, it must be noted, has no professional medical training. This ruse was frequently employed to make it look like the patient was homebound to justify billing the encounter as a home visit or to "justify" billing for unnecessary tests. The alterations made to patient records was not limited to patients with Parkinson's but was employed by Mobile flexibly to attempt to marry diagnoses, often false ones, with given patients with a variety of conditions. Other examples of chart forgery are adding shortness of breath to justify venous ultrasounds of the leg, and hypertension to justify echocardiograms.

38. Relator on or about while employed by Mobile personally observed several instances where Pavelchik had altered patients' medical charts by adding false diagnoses. Relator attempted in these instances to circle the Pavelchik's additions, and write "I did not write this" on the chart.

39. Pavelchik's actions are tightly controlled by Mobile's Corporate Headquarters in Chicago. Pavelchik receives daily feedback from Mobile's Corporate Headquarters demanding to know why such and such a test was not ordered.

40. Evidence of the widespread nature of these improper practices is found in the fact that Pavelchik is used by Mobile to open new offices since he is knowledgeable about Mobile's billing and charting practices.

## IX. BILLING FOR WORTHLESS TESTS

41. The testing equipment used by Mobile for the home tests is frequently non-

functional, but this does not stop Mobile from billing for these worthless tests. Relator examined Patient E in late 2011 and diagnosed Patient E with severe blockage in the carotid artery. Yet the test results of the Doppler ultrasound inaccurately reported normal finding, clearly an error. This was not an isolated incident.

42. The equipment Mobile routinely used was of such poor quality or so poorly maintained that a reviewing cardiologist would be unable to provide an accurate interpretation. Yet Relator rarely if ever saw a report which declined to provide an interpretation.

43. All of the echocardiograms done by Mobile in Phoenix were read by a cardiologist named Dr. Mohammed Toor, located in Joliet, Illinois. All of the ultrasounds were read by a doctor in Deerfield, Michigan.

## X. FAILURE TO REQUIRE MEDICARE COPAY

44. Medicare requires providers to collect 20% of the cost of the service provided to beneficiaries, or document its efforts to collect the co-pay from the beneficiary. Mobile makes no effort to collect the co-pay, thus encouraging the over utilization of its services.

45. Providers are required to undertake reasonable collection efforts, and the Office of Inspector General, Health and Human Services, has concluded that the failure of a provider to undertake these reasonable collection efforts could constitute a violation of the anti-kickback statute.

46. The Anti-Kickback Statute states in pertinent part;

> (b) Illegal remunerations
>
> (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind -
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part

> under a Federal health care program,
>
> * * *
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
>
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program,
>
> * * *
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. 1320a-7b.

47. The Anti-Kickback Statute prohibits the knowing and willful offer, payment, solicitation, or receipt of remuneration to induce federal health care program business. The Anti-Kickback Statute is designed to prevent financial incentives from influencing medical decisions.

48. The Anti-Kickback Statute is intended to prohibit any type of remuneration that can tend to influence health care decisions. To protect the federal healthcare programs from these harms, Congress enacted a *per se* prohibition against kickbacks in any form, even if the particular kickback does not result in over utilization or poor quality of care. The statute creates liability for both parties involved in the kickback transaction. For purposes of the Anti-Kickback Statute, remuneration includes the transfer of anything of value, in cash or in-kind, directly or indirectly, covertly or overtly, including free services.

49. Persons who violate the anti-kickback statute forfeit their right to bill federal health care programs, and FCA liability will attach as a matter of law.

50. Medicare providers are required to enter into provider agreements with the government in order to participate in the Medicare program. Medicare providers certify that they will comply with all laws and regulations concerning proper practices for Medicare providers. One of the laws included in the certification is the Anti-Kickback Statute. The Federal Government has taken the position that a Medicare provider's compliance with its provider agreement is a condition for receipt of payment under the Medicare program. Providers who violate the Anti-Kickback Statute are ineligible to participate in government health care programs, including Medicare, Medicaid, and Tricare. A provider who is in violation of the Anti-Kickback Statute is prohibited from submitting claims to the government. A violation of the Anti-Kickback Statute and the subsequent submission of claims for payment that the claimant knows are not owed makes the claims false under the FCA.

**COUNT I**
(31 U.S.C. §§ 3729(a) (1), (2) and (3))

51. Relator repeats and re-alleges each and every allegation contained above as if fully set forth herein.

52. Defendant Mobile, by billing Medicare using CPT codes 99344 and 99345 without meeting the requirements of these codes, presented to the United States false claims for payment, and used false statements to get false claims paid, with knowledge of their falsity or with reckless disregard for the truth, all in violation of the False Claims Act.

53. As a result of this false and fraudulent conduct the United States Government has been damaged in an amount to be determined at trial.

## COUNT II
(31 U.S.C. §§ 3729(a) (1), (2) and (3))

54. Relator repeats and re-alleges each and every allegation contained above as if fully set forth herein.

55. Defendant Mobile, by altering and forging patient medical records, used false statements to get false claims paid by submitting bills to Medicare for tests such as, but not limited to, echocardiograms, venous ultrasounds, Doppler carotid artery studies, with knowledge of their falsity, or with reckless disregard for the truth, all in violation of the False Claims Act.

56. As a result of this false and fraudulent conduct the United States Government has been damaged in an amount to be determined at trial.

## COUNT III
(31 U.S.C. §§ 3729(a) (1), (2) and (3))

57. Relator repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58. Defendant Mobile, by billing Medicare for diagnostic tests while using faulty equipment that yielded unreliable results, submitted claims for worthless services to the United States with knowledge of their falsity, or with reckless disregard for the truth, all in violation of the False Claims Act.

59. As a result of this false and fraudulent conduct the United States Government has been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of himself individually, and acting on behalf of, and in the name, of the Government of the United States, demands and prays that judgment be entered against the Defendant as follows:

    a.    That the Defendant shall be ordered to cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729-3732.

    b.    That judgment shall be entered against Defendant in the amount of three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of $11,000.00 for each act in violation of the False Claims Act, as provided by 31 U.S.C. § 3729(a), with interest.

    c.    That Relator shall be awarded the maximum amount available under 31 U.S.C. § 3730(d) of the False Claims Act for bringing this action, namely, 25 percent of the proceeds of the action or settlement of the claim if the United States intervenes in the matter, or pursues its claim through any alternate remedy available to the United States, (31 U.S.C. § 3730(c)(5)), or, alternatively, 30 percent of the proceeds of the action or settlement of the claim, if the United States declines to intervene.

    d.    That Relator shall be awarded all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by the False Claims Act, 31 U.S.C. § 3730(d).

    e.    And, that such other relief shall be granted in the favor of the United States and the Relator as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

Respectfully Submitted,

*/s/ Mike Rosenblat*
Attorney for Dr. Stephen Graham

James T. Ratner, Esq.
P.O. Box 1035
Woodstock, NY 12498
(845) 688-5222
jamestratner@yahoo.com

Michael Rosenblat
Rosenblat & Associates, LTD
707 Skokie Blvd., Suite 600
Northbrook, IL 60062
847-480-2390
mike@rosenblatlaw.com